# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIVIAN, LLC,

*Plaintiff*,

v.

CHARLES L. NORMAN, in his official capacity as the Registrar of Motor Vehicles of the Ohio Bureau of Motor Vehicles,

*Defendant.*

Case No. 2:25-cv-858

**Expert Report of Professor Fiona Scott Morton**

I. INTRODUCTION ........ 1

II. QUALIFICATIONS ........ 1

III. RIVIAN'S DIRECT SALES AND SERVICE MODEL ........ 4

IV. RIVIAN'S INCENTIVES TO SERVE CUSTOMERS WELL AND COMPLY WITH CONSUMER PROTECTION LAWS ARE AT LEAST AS STRONG AS THOSE OF INDEPENDENT DEALERS ........ 7

V. ECONOMIC HARM RESULTING FROM PROHIBITING RIVIAN'S DIRECT SALES MODEL ........ 10

A. Barring Rivian from Selling Direct to Consumers in Ohio Harms Consumers by Reducing Consumer Choice ........ 10

B. Barring Rivian from Selling Direct to Consumers in Ohio Harms Consumers by Introducing the Risk of Double Marginalization ........ 12

VI. EVALUATION OF POTENTIAL JUSTIFICATIONS FOR OHIO'S DIRECT-SALES PROHIBITION ........ 15

A. Vertical Integration of the Auto Industry Does Not Harm Competition ........ 15

B. Ohio's Sales Ban Does Not Enhance Community Development or Long-Term Customer Relationships ........ 19

C. Ohio's Sales Ban Has No Effect on the Availability of Service If the Manufacturer Fails ........ 22

D. There Is No Evidence or Theoretical Reason to Conclude that Dealers Will Provide More "Levels of Service" Than Manufacturers ........ 23

E. Franchised Dealers Are Not Able to Obtain Better Financing for Their Customers Than Manufacturers Can ........ 25

F. Manufacturers' Incentives Are at Least as Strong as Those of Franchised Dealers to Foster Long-Term Customer Relationships, to Cover Warranty and Out-of-Warranty Service Expense, and to Quickly and Effectively Act on Recalls ........ 27

G. Potential Justifications for Ohio's Direct-Sales Prohibition Are Inconsistent with Tesla's Direct Sales Operations in Ohio ........ 29

VII. AN INDEPENDENT RIVIAN DEALER WOULD NOT BE ECONOMICALLY VIABLE ........ 30

VIII. CONCLUSION ........ 31

## I. INTRODUCTION

1. I have been retained by Rivian, LLC ("Rivian") in connection with its lawsuit against the Registrar of Motor Vehicles of the Ohio Bureau of Motor Vehicles. Rivian has asked me to prepare this report to explain the economic harm that results from Ohio's ban on direct sales of automobiles by manufacturers other than Tesla, Inc. ("Tesla") and the absence of any economic basis for application of that ban to automotive companies like Rivian that do not utilize independent dealers.[1]

2. As I explain in the main body of this report, Rivian has powerful incentives to serve customers well and comply with consumer protection laws. These incentives are at least as strong as those of an independent dealer. Ohio's direct-sales ban stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market. Allowing Rivian to sell directly to consumers in Ohio would increase consumer choice and eliminate the risk of higher prices from double marginalization. Potential justifications for barring manufacturers (or entities affiliated with manufacturers, like Rivian, LLC) from selling cars directly to consumers in Ohio do not hold water as an economic matter and are inconsistent with the fact that Tesla has conducted direct sales operations in Ohio since 2013. Permitting Rivian to sell directly to consumers in Ohio promotes the public interest by increasing competition, serving local consumers, contributing to the local economy, creating jobs, and raising tax revenue. Furthermore, an independent Rivian dealer would not be economically viable. Thus, requiring Rivian to sell its vehicles through an independent dealer effectively bars Rivian from selling in Ohio.

## II. QUALIFICATIONS

3. I am the Theodore Nierenberg Professor of Economics at the Yale University School of Management, where I teach courses in the area of competitive strategy and conduct

[1] Rivian vehicles are manufactured by Rivian Automotive, LLC, a wholly-owned subsidiary of Rivian LLC. For ease of reference, this report will refer to the entities collectively as "Rivian."

research into empirical industrial organization. I am also a Visiting Professor at the University of Edinburgh, a Senior Fellow at Bruegel, the Founder and Director of the Thurman Arnold Project at Yale, a Senior Consultant at Charles River Associates, and a Research Associate at the National Bureau of Economic Research. I hold a bachelor's degree in Economics from Yale University and a Ph.D. in Economics from the Massachusetts Institute of Technology.

4. I have been a professor at Yale since 1999, during which time I have been the Senior Associate Dean for Faculty Development. Before becoming a professor at Yale, I was an Assistant Professor of Economics and Strategy at the University of Chicago's Graduate School of Business. Before that, I was an Assistant Professor of Strategic Management at Stanford University's Graduate School of Business.

5. From 2011 to 2012, I held the position of Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice. In that role, I supervised the economists in the Antitrust Division analyzing the cases that came before the Division. In many of these cases, the economists at the Division developed and assessed evidence of whether an organization's behavior was pro- or anti-competitive in light of the net impact of the behavior on consumers in terms of price, innovation, or quality.

6. In a typical year, I teach all or part of three courses at Yale University: two courses at the Yale School of Management—Competitive Strategy and Advanced Competition Economics and Policy—and one course at Yale Law School—Antitrust Law. Competitive Strategy is an MBA elective course covering theories of how firms compete, including competition with respect to price, quantity, entry and exit into the market, research and development, and product differentiation. Advanced Competition Economics and Policy and Antitrust Law focus on antitrust concepts.

7. I have published dozens of articles in peer-reviewed journals. I also have served in an editing role on various academic economics journals, and I referee for a number of journals, including the *Review of Economic Studies*, the *Quarterly Journal of Economics*, the

*RAND Journal of Economics*, the *Journal of Industrial Economics*, and the *Journal of Law and Economics*. I am also a member of the American Economic Association.

8. My research is in the field of empirical industrial organization, which is the application of empirical methods to the field of industrial organization. The field of industrial organization examines the structure of firms and markets, including competitive markets and monopolies. My work focuses on empirical studies of competition among companies and firms, including in areas such as pricing and entry.

9. I have researched and published peer-reviewed articles about the automotive industry, including on price negotiation in U.S. auto retailing, state franchise laws related to dealer terminations, internet auto retailing and transactions, price discrimination against women and minorities at dealerships, and inventory fluctuations at dealerships. Several of these papers received recognition in the profession, including the Green Award from the *Journal of Marketing Research* for the paper on internet auto retailing and transactions.

10. I have testified as a qualified expert about the auto dealer franchise system, including the economics of the system. **Appendix A** is a copy of my curriculum vitae.

11. To prepare this report, I have reviewed legal filings in this matter, my prior research on retail sales and the dealership model in the automotive industry,[2] as well as academic articles and publicly available information concerning Rivian, its retail strategy, and the economics of automobile distribution. A list of the materials I have reviewed and relied upon is in **Appendix B**. While the opinions presented herein are complete based upon the information and documents available to me to date, I reserve the right to expand, modify or reduce my

[2] For example, Fiona Scott Morton, Florian Zettelmeyer, and Jorge Silva-Risso, "Internet Car Retailing," The Journal of Industrial Economics 49, no. 4 (2001): 501-519; Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," Journal of Economic Perspectives, 24, no. 3 (2010): 233-250 and online appendix, available at https://assets.aeaweb.org/asset-server/articles-attachments/jep/app/2403_morton_app.pdf ["Lafontaine and Scott Morton (2010)"]; Fiona Scott Morton and Ann McDermott, "Retail Auto Sales: Tesla v. State Vehicle Franchise Laws (2017)," in John E. Kwoka, Jr. and Lawrence J. White (eds.), The Antitrust Revolution, Economics, Competition, and Policy (7th Edition). New York: Oxford University Press (2018).

findings and conclusions based upon my review of any further disclosures made by any other expert, additional information, or documentation provided in this matter, or on testimony and exhibits introduced at subsequent depositions or hearings.

12. Rivian has retained me at an hourly rate of $1,350 per hour. This compensation is not contingent in any way on the outcome of this matter.

## III. RIVIAN'S DIRECT SALES AND SERVICE MODEL

13. Rivian is a U.S. manufacturer of all-electric vehicles ("EVs"). It delivered its first Launch Edition R1T pickup truck in September 2021.[3] Rivian currently offers two consumer vehicle product lines: the R1T, a two-row, five-passenger pickup truck, and the R1S, a three-row, seven-passenger sport utility vehicle.[4] The R1T and R1S have been recognized as "Top Safety Picks" by the Insurance Institute for Highway Safety every year since 2023, and the R1T was also recognized as a "Top Safety Pick" in 2022.[5] Rivian's new midsize SUV, the R2, is currently available for reservation, with delivery expected to begin in 2026.[6] Rivian's R3, a midsize crossover, is expected to be available in 2027.[7] Rivian also produces long-range electric

---

[3] Rivian Automotive, Inc., "Prospectus filed pursuant to Rule 424(b)(4)," filed November 9, 2021 ["Rivian Prospectus"], available at https://www.sec.gov/Archives/edgar/data/1874178/000119312521328239/d157488d424b4.htm, p. 1.

[4] Rivian Automotive, Inc. Form 10-K for the fiscal year ended December 31, 2024 ["Rivian 2024 Form 10-K"], available at https://www.sec.gov/Archives/edgar/data/1874178/000187417825000007/rivn-20241231.htm, p. 4.

[5] Insurance Institute for Highway Safety, "2022 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2022/all/rivian#award-winners; Insurance Institute for Highway Safety, "2023 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2023/all/rivian#award-winners; Insurance Institute for Highway Safety, "2024 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2024/all/rivian#award-winners; Insurance Institute for Highway Safety, "2025 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2025/all/rivian#award-winners.

[6] Rivian 2024 Form 10-K, p. 4; Rivian Website, "Let's start your R2 reservation," available at https://rivian.com/reserve/r2.

[7] Rivian 2024 Form 10-K, p. 4; Car and Driver, "2027 Rivian R3/R3X," available at https://www.caranddriver.com/rivian/r3; Kelley Blue Book, "2027 Rivian R3," available at https://www.kbb.com/rivian/r3/.

commercial vans for Amazon and other commercial customers.[8] From 2021 to 2025, Rivian delivered more than 160,000 consumer and commercial vehicles.[9]

14. Rivian's R1T and R1S are billed as "[e]lectric vehicles designed for adventure" and are built with off-road capability and a focus on performance, utility, and safety.[10] The R1S has a range of up to 410 miles per charge and the R1T has a range of up to 420 miles per charge.[11] Rivian's proprietary nationwide network, the Rivian Adventure Network, has more than 780 charging stalls in the United States.[12] Rivian's vehicles are compatible with 227,000 chargers in North America.[13]

15. Rivian's vehicles are manufactured in Normal, Illinois.[14] Rivian is planning to construct a second manufacturing facility near the city of Social Circle, Georgia starting in 2026.[15] Rivian's Normal manufacturing facility is equipped to produce up to 150,000 vehicles annually when the equipment is operated at full rate and on multiple shifts. The Normal facility's annual production capacity is expected to increase to 215,000 vehicles in 2026. Rivian's Social Circle facility will support demand from the United States and international marketplaces and is anticipated to have an annual production capacity of 200,000 vehicles by 2028.[16]

16. Rivian has developed a direct sales and service model that it believes will benefit its customers and support its efficient growth.[17] Rivian-owned and operated retail locations

---

[8] Rivian 2024 Form 10-K, p. 5.
[9] Rivian Automotive, Inc. Form 10-K for the fiscal year ended December 31, 2025, available at https://www.sec.gov/Archives/edgar/data/1874178/000187417826000008/rivn-20251231.htm, p. 61; Rivian 2024 Form 10-K, p. 67; Rivian Prospectus, p. 1.
[10] Rivian Website, "Electric vehicles designed for adventure," available at https://rivian.com/.
[11] Rivian Website, "R1S," available at https://rivian.com/r1s; Rivian Website, "R1T," available at https://rivian.com/r1t.
[12] Rivian Website, "What is the Rivian Adventure Network?" available at https://rivian.com/support/article/what-is-the-rivian-adventure-network; EV Charging Stations, "Rivian Adventure Network Expands to 780+ Chargers: Q2 2025 Report," August 7, 2025, available at https://evchargingstations.com/chargingnews/rivian-q2-2025-report/.
[13] Rivian Website, "Charging is easier than you think," available at https://rivian.com/experience/charging.
[14] Rivian 2024 Form 10-K, p. 6.
[15] Rivian 2024 Form 10-K, p. 6.
[16] Rivian 2024 Form 10-K, p. 6.
[17] Rivian Prospectus, p. 2; Rivian 2024 Form 10-K, pp. 3-4, 7, 25.

called Spaces do not maintain an inventory of new motor vehicles for sale; instead, Rivian vehicles are custom built to order and delivered directly to customers.[18] Rivian's vehicles are sold to customers in a low-pressure and relaxed environment and at a fixed, uniform price that depends only on the configuration of options and accessories chosen by the customer.[19] Rivian Financial Services, offered through a partnership with Chase Bank, helps customers seeking to finance their vehicle purchases.[20] Rivian does not use independent dealers to sell its vehicles.

17. Rivian currently has 36 Spaces in the United States, which are retail showrooms that provide sales support, demonstration drives, and brand building.[21] At Rivian's "Hub" Space in Venice Beach, California, new and existing Rivian customers can learn about Rivian vehicles and charging, gather with community members, bring family members to connect and play, and speak with a team member about local adventure.[22] Rivian also has three "Outposts" located near adventure destinations which offer high-speed charging stations as well as snacks and space to relax.[23]

---

[18] Rivian Prospectus, p. 138; Rivian Website, "Purchasing: Explore Rivian's online purchasing process," available at https://rivian.com/experience/purchasing.

[19] Rivian Website, "What is the Starting Price," available at https://rivian.com/support/article/what-is-the-starting-price; A Girl's Guide to Cars, "Think Car Shopping is Boring, or Scary? Rivian Just Reinvented the Showroom and Test Drive," June 2, 2025, available at https://agirlsguidetocars.com/rivian-space-new-york-experience-review/.

[20] Rivian Prospectus, p. 132; Chase, "Rivian, Chase Partner to Create an All-Digital Customer Financing Experience," January 14, 2021, available at https://media.chase.com/news/rivian-chase-partner-to-create-an-all-digital-customer-financing-experience; Rivian Website, "What bank does Rivian work with to offer financing?" available at https://rivian.com/support/article/what-bank-does-rivian-work-with-to-offer-financing.

[21] Rivian Website, "Plan your next visit," available at https://rivian.com/spaces/locations. This count omits U.S. locations listed as "Service+Demo Centers" or "Charging Outposts" and includes all other U.S. locations, including three listed as "Education Centers" and the Venice Beach "Hub." Rivian Website, "Spaces," available at https://rivian.com/spaces.

[22] Rivian Prospectus, p. 126; Rivian Website, "A Space to Gather," available at https://stories.rivian.com/venice-hub; Rivian Website, "What are Rivian spaces?" available at https://rivian.com/support/article/what-are-rivian-spaces; Rivian Website, "What can I expect at a Rivian Hub?" available at https://rivian.com/support/article/what-can-i-expect-at-a-rivian-hub.

[23] Rivian Website, "Introducing Rivian Charging Outposts," available at https://stories.rivian.com/yosemitechargingoutpost; Modern Retail, "Rivian's charging outposts are a glimpse into the rest stop of the future," August 25, 2025, available at https://www.modernretail.co/operations/rivians-charging-outposts-are-a-glimpse-into-the-rest-stop-of-the-future/; Rivian Website, "The Hamptons, NY Charging Outpost," available at https://rivian.com/spaces/hamptons.

18. Service for Rivian vehicles is provided through a combination of Rivian owned and operated service centers, mobile service vehicles, over-the-air diagnosis and repair, and Rivian-certified independent collision repair centers for body repairs.[24] Rivian currently has 84 service centers in 35 states, including 3 service centers in Ohio.[25]

19. Rivian's direct-sales model differs from that of independent dealers. Under the independent dealership model, the dealer has a contract with a vehicle manufacturer. The dealer buys vehicles from the manufacturer at a wholesale price and maintains an inventory of vehicles on its lot. The dealer maintains a showroom and sales staff to sell new vehicles, and offers service and repairs, including warranty and non-warranty repairs for vehicles produced by the manufacturer and non-warranty service work for vehicles produced by other manufacturers. Typically, commissions or volume-based bonuses are important for compensation of the sales team.[26] The staff is also incentivized through commissions to sell "add-ons" such as additional features, service contracts, and warranties. Prices for new vehicles and "add-ons" are usually negotiable, with the dealer attempting to obtain the highest price possible.

## IV. RIVIAN'S INCENTIVES TO SERVE CUSTOMERS WELL AND COMPLY WITH CONSUMER PROTECTION LAWS ARE AT LEAST AS STRONG AS THOSE OF INDEPENDENT DEALERS

20. Proponents may claim that banning direct sales of motor vehicles furthers the State's interest in protecting its citizens from fraud, unfair practices, discrimination, or other abuses. Yet, banning direct sales by vehicle manufacturers like Rivian and requiring cars to be

---

[24] Rivian Website, "How Does Service Work?" available at https://rivian.com/support/article/how-will-service-work; Rivian Website, "What are remote diagnostics?" available at https://rivian.com/support/article/what-are-remote-diagnostics; Rivian Prospectus, p. 126; Rivian 2024 Form 10-K, pp. 4-5.

[25] Rivian Website, "Where are Rivian Service Centers located in the United States?" available at https://rivian.com/support/article/where-are-rivian-service-centers-located-in-the-united-states.

[26] Indeed, "How Much Does a Car Salesperson Make?" July 21, 2022, available at https://www.indeed.com/career-advice/pay-salary/how-much-does-a-car-salesperson-make; Edmunds, "Where Does the Car Dealer Make Money?" December 16, 2025, available at https://www.edmunds.com/car-buying/where-does-the-car-dealer-make-money.html; Carmax, "Check out the Total Compensation Highlight Video," available at https://learn.bswift.com/carmax/stock-incentive-program; Auto Companion, "How Dealers Hit Volume Bonuses (Stair-Step Programs)," December 11, 2025, available at https://www.autocompanion.com/article/bf607208-a4c0-4f09-aa42-62d9d21ce2f0.

sold through independent dealers does not further that interest. Consumer advocacy groups have characterized bans on direct sales as "unnecessary for consumer protection."[27]

21. As an economic matter, there is nothing inherent about vehicle manufacturers that makes them more likely than independent dealers to engage in abusive practices towards consumers. Engaging in unfair practices harms a manufacturer's brand and can ruin its relationship with its customers. Independent dealers also have an interest in avoiding abusive practices, but there is no evidence or theoretical reason for why a dealer's interest would be stronger than that of a manufacturer. If anything, a manufacturer has a greater incentive than independent dealers to ensure the long-term growth of its brand and relationship with customers, because a manufacturer can keep a customer even if the customer moves from one geographic location to another, whereas independent dealers are likely to lose customers who move. These incentives are magnified in the case of Rivian, which is a relatively new market entrant trying to establish its brand through word-of-mouth and goodwill. Moreover, numerous state and federal laws barring fraud and other unfair business practices apply to auto manufacturers just as they do to independent dealers or any other business. There is no plausible explanation for why a vehicle manufacturer would be any more likely to engage in abusive practices than an independent dealer in light of these economic incentives and anti-fraud laws. For example, it would be difficult to reconcile this notion with the fact that Tesla (a manufacturer) is allowed to sell directly to consumers in Ohio or with the fact that Ohio allows Rivian to provide maintenance and repair services for Rivian vehicles in the state.[28]

22. Furthermore, state franchise laws that provide protections for independent franchise dealers may make it harder to address abusive practices by those dealers. In the state of

---

[27] "Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 16, 2015, available at https://s3-prod.autonews.com/s3fs-public/CA98362217.PDF. *See also* Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003.

[28] Rivian has three service centers in the state of Ohio, in Cleveland, Groveport, and Sharonville (Rivian Website, "Where are Rivian Service Centers located in the United States?" available at https://rivian.com/support/article/where-are-rivian-service-centers-located-in-the-united-states).

Ohio, a manufacturer may not terminate an independent franchise dealer even though there is a "[a] loss of trust by the franchisor absent circumstances or facts that would be a material breach of the franchise agreement and that material breach is known and ratified by the owners of the new motor vehicle dealer."[29] By making it difficult and burdensome for manufacturers to discontinue their relationships with independent franchised dealers even in such circumstances, state franchise laws may insulate poor-performing and abusive dealers and undermine consumer protection.

23. Over the past decade, consumer advocacy groups, public policy centers, leading academics, and the Federal Trade Commission ("FTC") have opposed bans on direct auto sales as anti-consumer and protectionist.[30] This is not to say that all franchised dealers engage in fraud or other unfair business practices. Rather, a law requiring cars to be sold by franchised dealers cannot reasonably be justified as an effort to avoid abusive practices towards consumers, particularly when there is no plausible basis to conclude that car manufacturers are more likely to engage in such practices than dealers. Every manufacturer and dealer has a strong incentive to avoid such practices. Furthermore, banning sales by direct-sales manufacturers other than Tesla

[29] Ohio Laws & Administrative Rules, "Section 4517.55 | Determination of good cause to terminate franchise," at § 4517.55(B)(6), available at https://codes.ohio.gov/ohio-revised-code/section-4517.55.

[30] Georgeta Dragoiu, "Ban on Direct Auto Sales Hurts Consumers and Innovation in Texas," February 25, 2016, available at https://www.tribtalk.org/2016/02/25/ban-on-direct-auto-sales-hurts-consumers-and-innovation-in-texas/; Mississippi Center for Public Policy, "Bill to Ban Direct Vehicle Sales is Anti-Consumer Choice," February 24, 2022, available at https://mspolicy.org/bill-to-ban-direct-vehicle-sales-is-anti-consumer-choice/; "Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 16, 2015, available at https://s3-prod.autonews.com/s3fs-public/CA98362217.PDF; Open Letter by Academics in Favor of Direct EV Sales and Service, Apr. 14, 2021, available at https://laweconcenter.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide-Academics-Letter-4.14.pdf; Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003; Marina Lao, Debbie Feinstein and Francine Lafontaine, FTC Competition Matters Blog, "Direct-to-Consumer Auto Sales: It's Not Just About Tesla," May 11, 2015, available at https://www.ftc.gov/enforcement/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla; FTC Staff Comment Regarding Michigan Senate Bill 268, May 7, 2015, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf.

forces consumers who want to buy from those direct-sales manufacturers to do so from out of state, where any unfair practices would be more difficult for regulators in Ohio to detect and prosecute.

## V. ECONOMIC HARM RESULTING FROM PROHIBITING RIVIAN'S DIRECT SALES MODEL

24. This section explains how Ohio's prohibition on direct sales by auto manufacturers other than Tesla protects incumbent manufacturers and dealers at the expense of competition and consumers. It shows that authorizing Rivian to sell direct to consumers in Ohio would benefit consumers by increasing consumer choice and eliminating the risk of double marginalization.

### A. Barring Rivian from Selling Direct to Consumers in Ohio Harms Consumers by Reducing Consumer Choice

25. Rivian's direct-sales model, including uniform prices and a low-pressure and relaxed environment in which consumers can shop for a vehicle, is rare in the auto industry. This alternative model is good for the consumer because it creates more choices, and some consumers may prefer the new model over traditional car buying. If consumers like this retail experience, and the retail experience is one factor that drives Rivian's sales, this will put competitive pressure on traditional dealers. Competing dealers will want to improve their own buying experience in order to retain consumers, and all consumers will benefit from the resulting competition.

26. If Rivian is not permitted to sell its vehicles in Ohio, Ohioans will be denied ready access to Rivian's new vehicles. Potential Rivian buyers might not hear of Rivian vehicles or obtain purchase information, nor would they be able to test-drive a Rivian vehicle in Ohio. Consumers in Ohio would thereby be denied choices in their car buying process. Dealers of competing automakers would have fewer incentives to compete on the basis of lower prices or superior customer service.

27. It is important to emphasize that there is no risk of harm to competition from Rivian's direct-sales model. If Rivian's direct-sales model or its vehicles are not desired by

consumers or if consumers judge Rivian's vehicle prices to be too high, Rivian's vehicles will not be purchased. This is standard and expected in a competitive market.

28. The two government agencies tasked with enforcing U.S. competition laws, the FTC and the U.S. Department of Justice, support the conclusion that bans on direct sales by vehicle manufacturers harm competition and consumers.[31] In multiple submissions to state legislatures, the FTC has explained that giving automakers the freedom to choose the sales model that makes the most sense for them, and letting the market determine whether they succeed or fail, is in the best interest of consumers and competition.[32] Leading academics in economics, competition policy, market regulation, industrial organization, and other disciplines have also opposed state bans on direct sales by electric vehicle manufacturers.[33]

29. This position comports with the basic lessons of microeconomics. While there are arguably credible reasons to restrict an automaker with an existing network of independent dealers from selling in direct competition with those dealers, there is no reason to require a

[31] Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download.

[32] "Our principal point is this: absent some legitimate public purpose, consumers would be better served if the choice of distribution method is left to motor vehicle manufacturers and the consumers to whom they sell their products." (FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014, p. 8, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-new-jersey-general-assembly-regarding-assembly-bills-2986-3096-3041-3216-which/140516nj-autoadvocacy.pdf). *See also* FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-missouri-house-representatives-regarding-house-bill-1124-which-would-expand/140515mo-autoadvocacy.pdf; FTC Staff Comment Regarding Michigan Senate Bill 268, May 7, 2015, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf; Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download.

[33] Open Letter by Academics in Favor of Direct EV Sales and Service, Apr. 14, 2021, available at https://laweconcenter.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide-Academics-Letter-4.14.pdf.

vehicle manufacturer to go out and contract with independent dealers in order to reach its customers. Consumers are made better off when given the right to choose the retail sales business model and vehicle that they prefer, rather than having their state government choose it for them.

### B. Barring Rivian from Selling Direct to Consumers in Ohio Harms Consumers by Introducing the Risk of Double Marginalization

30. Selling vehicles through an independent dealer, as is required in Ohio for all manufacturers except Tesla, introduces the risk of "double marginalization." Under the traditional auto retail sales model, two independent parties strive to maximize their profits—the auto manufacturer and its dealers. Double marginalization is thus inherent in the traditional franchised dealership model: first, the manufacturer marks-up its manufacturing costs to arrive at the wholesale price; second, the dealership adds an additional markup to produce the retail price. The vehicle manufacturer sets a wholesale price with a profit margin that maximizes its profits in light of "*inter*brand" competition for vehicles, that is, competition between different brands of automobile (Ford, GM, etc.). For example, Rivian wants consumers to buy its vehicles rather than a Land Rover or a Tesla and sets its price accordingly. That wholesale price is an input cost for the independent dealer. The dealer then maximizes its profits by setting a retail price that reflects the wholesale vehicle price, dealership costs, interbrand competition in retailing, and "*intra*brand" competition in retailing, that is, competition between dealers of the same brand of automobile. This situation results in what economists term "double marginalization." If a manufacturer has the same costs to retail its vehicles as does an independent dealer, then double marginalization results in higher prices to consumers and lower demand, compared to a system in which final selling prices are under the control of a single economic entity.[34]

31. As a matter of economics, there is no reason to expect a manufacturer who sells directly to consumers will incur a higher cost to retail its vehicles than it would if it were to sell

---

[34] Roger D. Blair and Francine Lafontaine. 2005. *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188; W. Kip Viscusi, Joseph E. Harrington, and John M. Vernon. 1992. Economics of Regulation and Antitrust, Lexington, Massachusetts: D.C. Heath and Company, pp. 221-224.

through independent dealers. A manufacturer who sells directly to consumers may incur lower sales-related costs through consolidation of roles and resources. A manufacturer focused on customer education may find it more efficient to sell directly to consumers, because selling through independent dealers may require additional monitoring costs to ensure a consistent sales experience. Moreover, even if an independent dealer had lower costs to retail than a manufacturer, and even if the dealer passed those cost savings along to the consumer in the form of lower prices, that savings would not eliminate the risk of double marginalization, it would instead merely offset some of the higher costs imposed by double marginalization. An independent dealer would have to have substantially lower costs at retail than a manufacturer to offset the higher costs imposed by double marginalization. I am not aware of evidence suggesting that independent dealers would have such substantially lower costs to retail than a manufacturer.

32. **Chart 1** is a simplified illustration of how eliminating double marginalization leads to lower prices and increased demand.[35] With double marginalization (in orange), the dealer maximizes its profits by setting a sales price where its marginal revenue equals the wholesale price it pays for cars plus its marginal retail costs. The resulting price is higher than the price the automaker would set if it sold directly to the consumer. Without double marginalization (in blue), the automaker with direct sales maximizes its profits by setting a price where its marginal revenue equals its marginal cost to produce and sell its vehicles. The price without double marginalization is lower, resulting in increased demand.

---

[35] A more detailed explanation is available in Roger D. Blair and Francine Lafontaine. 2005. *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188.

**Chart 1: Illustration of Double Marginalization**




33. As illustrated by **Chart 1**, a direct-sales model, such as is used by Rivian, eliminates the separate process of setting a dealer mark-up. Even if the manufacturer has the same costs to retail its vehicles as does an independent dealer, the final retail price is lower than it would be if the vehicle was marked up by both the manufacturer and the dealer, because the manufacturer's cost for the vehicle is below the wholesale cost paid by the dealer. In other words, dealers bear an additional cost relative to the direct-sales model, which leads dealers to set a higher retail price relative to the direct-sales model. Intrabrand competition among dealers will not dissipate the price difference between dealers and the direct-sales model, because the difference stems from the additional cost borne by dealers combined with their own need to make a profit.

34. Furthermore, intrabrand competition among dealers may be limited by state regulations which limit dealership entry and relocation. In the state of Ohio, a dealership that proposes to enter or relocate to a particular "relevant market area" (defined as any area within a

radius of ten miles from the site of a potential new dealership)[36] must notify each dealership that sells cars of the same make in that relevant market area. If a dealership protests the proposed entry or relocation, Ohio's motor vehicle dealers board conducts a hearing to determine whether or not there is "good cause" for permitting the proposed entry or relocation.[37] Industry observers have noted that state regulations which limit dealership entry and relocation may limit dealerships' responsiveness to increases in demand, resulting in higher prices.[38]

35. With its direct-sales model, Rivian's prices are limited by interbrand competition among the different automakers. Rivian wants consumers to buy its vehicle rather than a BMW or a Mercedes and sets its price accordingly. Rivian has strong incentives to manage its sales operations as efficiently as possible and has no incentive to raise its prices at the retail level beyond the level that best enables it to compete with other manufacturers. Consumers benefit from the opportunity for increased price competition.

## VI. EVALUATION OF POTENTIAL JUSTIFICATIONS FOR OHIO'S DIRECT-SALES PROHIBITION

36. I discuss potential justifications for Ohio's vehicle manufacturer direct-sales prohibition below.

### A. Vertical Integration of the Auto Industry Does Not Harm Competition

37. Proponents may claim that Ohio's direct-sales ban is supported by a State interest in preventing vertically integrated manufacturers from competing in and detrimentally affecting

[36] Ohio Laws & Administrative Rules, "Section 4517.01 | Motor vehicle dealer, auction owner and salesperson definitions," available at https://codes.ohio.gov/ohio-revised-code/section-4517.01.

[37] Ohio Laws & Administrative Rules, "Section 4517.50 | Notice of establishment of new dealer or relocation," available at https://codes.ohio.gov/ohio-revised-code/section-4517.50.

[38] *See*, for example, FTC Staff Comment Regarding Michigan Senate Bill 268, May 7, 2015, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf; Steve Pociask, "Corporate Welfare: How Automobile Dealership Franchise Regulations Cost Consumers an Additional $48 Billion Annually," American Consumer Institute Center for Citizen Research, 2018, at p. 5, available at https://www.theamericanconsumer.org/wp-content/uploads/2018/03/ConsumerGram-2018-FINAL-1.pdf.

competition in downstream markets. This contention can be read narrowly or broadly. The narrow reading would be that preventing auto manufacturers from selling directly will prevent manufacturers from competing unfairly with their independent franchised dealers. If that is the State's justification, it does not apply here because Rivian does not have any independent franchised dealers.

38. The broader reading would be that proponents are asserting an interest in outlawing vertical integration as a general matter, regardless of the specific characteristics of the relevant industry. If that is the State's justification, it is overbroad and economically unsupported. As discussed, vertical integration can bring cost efficiencies that benefit consumers. Many manufacturers, including Apple, Microsoft, Lego, Burton, and Bose, have a vertically integrated sales channel without harm to consumers. If Ohio were right that outlawing vertical integration were itself a rational state interest, then Ohio or any other state could preclude all these companies from selling their products through their own stores. The State has put forward no evidence or theoretical rationale for such an extreme result, and I am aware of none. It is certainly true that there are circumstances in which an economist would be concerned about harm to competition from vertical integration.[39] But none of these circumstances is present when auto manufacturers, such as Rivian, sell their vehicles directly to consumers.

39. For example, consumers may be harmed by vertical integration if such integration includes so-called "exclusionary effects," such as input foreclosure or customer foreclosure. Input foreclosure can occur when an upstream firm with market power raises the costs or reduces the quality of its input to rivals of its downstream business. For example, the Department of Justice sued to block Google's 2010 merger with ITA Software, the developer of a widely used airfare pricing and shopping engine, on the grounds that the merger would give Google the

[39] A 2014 overview of the potential competitive effects of vertical mergers touches on the key risks to competition and potential benefits of vertical integration. It also lists litigation around vertical mergers and the concerns considered. *See*, Steven C. Salop and Daniel P. Culley, "Potential Competitive Effects of Vertical Mergers: A How-To Guide for Practitioners," Georgetown University Law Center, 2014 ["Salop and Culley (2014)"].

means and incentive to foreclose rival online travel intermediaries who depended on ITA's software.[40] But there is no risk of input foreclosure here. Rivian only sells Rivian vehicles. Allowing Rivian to sell direct to consumers, in Ohio or elsewhere, does not harm Ford's ability to establish a new Ford dealership, nor does it harm intrabrand competition for Fords. As a result, Rivian's sales model cannot harm downstream competition through input foreclosure—Ford dealers will still buy from Ford, and Rivian will sell Rivian vehicles.

40. Customer foreclosure, in contrast, occurs when the downstream operation of an integrated firm reduces input purchases from other upstream firms, in favor of its own upstream sales. For instance, customer foreclosure risks were analyzed in the merger of Comcast with NBC Universal, where the concern was that Comcast might reduce its use of other content suppliers in favor of NBC Universal.[41] There is no risk of customer foreclosure with direct car sales. Again, Rivian only sells Rivian vehicles, not Ford vehicles. Moreover, Ford would not sell Ford vehicles to Rivian for resale, even if Rivian wanted to buy them. Allowing Rivian to sell directly will thus have no impact on Ford's ability to sell Ford vehicles through Ford dealers.

41. Another way in which vertical integration can harm consumers and competition is through "reduced entry." Reduced entry may occur when vertical integration eliminates a potential entrant into the upstream or the downstream market. For instance, when Live Nation and Ticketmaster announced their merger in 2010, a concern raised by the Department of Justice was that Live Nation was a potential entrant into the ticketing market.[42] Reduced entry is not a risk here because Rivian is not seeking to acquire existing businesses (such as Ford dealerships) to operate its stores. Nor would Rivian otherwise enter the market as a Ford dealer. Thus, allowing Rivian to sell directly to consumers does not eliminate potential entry into auto retail

---

[40] The final judgment in the case defined a structure protecting ITA's customers' access to the software for five years. *United States of America v. Google Inc. and ITA Software, Inc.*, Case No. 1:11-cv-00688, Final Judgment, filed October 5, 2011, available at https://www.justice.gov/atr/case-document/file/497636/download.
[41] Salop and Culley (2014), p. 21.
[42] *Id.*, p. 11 and fn. 19.

markets. Just the opposite—for the reasons explained in Section VII below, it is Ohio's ban that prevents Rivian (and other potential entrants) from entering the Ohio auto retail market.

42. Finally, vertical integration can harm consumers if such integration leads to the harmful sharing of competitors' sensitive information. This problem can occur when a supplier to multiple customers merges with one customer and shares with it competitively sensitive information on its rivals. Harmful information sharing was a concern, for example, when Coca Cola acquired a major bottler that also bottled, distributed, and sold Dr. Pepper products.[43] But while harmful sharing of competitors' sensitive information could be a concern for an auto manufacturer acquiring a retailer who has pre-existing relationships with other manufacturers, there is no such risk in Rivian's direct sales of Rivian vehicles to consumers.

43. Contrary to any assertion that Rivian's vertical integration harms consumers, some elements of Rivian's differentiated customer-service experience are possible precisely because of its vertical integration. For instance, Rivian is able to offer services—such as over-the-air updates and integration between service technicians and Rivian engineers—because Rivian can integrate technological systems without the impediment of franchised dealers whose incentives can be at odds with their manufacturers'. This integration also enables a tight feedback loop, where consumer inquiries can be directed to the engineering team, which can not only address that inquiry, but also gain insight that helps them improve vehicle design and performance.[44] An outright ban on vertical integration would preclude Rivian and other manufacturers from providing consumers the choice of these differentiated services, with no corresponding consumer benefit, in addition to imposing the risk of double marginalization discussed above.

---

[43] *Id.*, p. 22 and fn. 42.
[44] Rivian 2024 Form 10-K, p. 4 ("Rivian also offers an integrated set of software and services that span across the entire purchase and ownership process. These services include remarketing, vehicle repair and maintenance, charging, software subscriptions, financing, insurance, and more. Interconnected by our data and analytics backbone, our services are designed to deliver fast-paced innovation cycles, structural cost advantages, and exceptional customer experiences.")

44. Consistent with these arguments, I understand that among the 25 states[45] in which Rivian can sell directly to consumers, none has alleged that Rivian's vertically integrated business model has led to reduced competition in vehicle sales. It is also notable that Ohio law does not prevent manufacturers from vertically integrating in many respects. For example, as discussed above, Rivian can and does service Rivian vehicles in Ohio. I am not aware of any allegation that Rivian's vertical integration regarding vehicle service and other permissible activities under Ohio law has led to reduced competition or other harms.

### B. Ohio's Sales Ban Does Not Enhance Community Development or Long-Term Customer Relationships

45. Proponents may claim that direct-sales bans are necessary to maintain strong and sound dealerships in order to provide stable employment to the citizens of this state and other community benefits. In support of this argument, proponents may claim that "local independent" franchised dealers are more likely to invest in community development and seek to build long-term customer relationships.

46. The first problem with this argument is that many dealers are now owned by large dealership conglomerates.[46] Those dealers are "local" only in the same sense that manufacturers like Rivian would be local if they were permitted to open Spaces in the state. For example, AutoNation and Penske each own numerous dealers in Ohio.[47]

---

[45] Rivian 2024 Form 10-K, p. 9 ("As of December 31, 2024, 25 states and the District of Columbia permit Rivian, as a manufacturer of motor vehicles, to obtain a dealer license to conduct vehicle sales, provided we meet certain requirements.")

[46] In 2011, the top 10 dealership groups accounted for 5.3% of franchised dealerships in the US. In 2024, the top 10 dealership groups accounted for 10.5% of franchised dealerships in the U.S.. In 2011, the top 150 dealership groups accounted for 13.9% of franchised dealerships in the US. In 2024, the top 150 dealership groups accounted for 26.6% of franchised dealerships in the US. (Automotive News, "2025 Top 150 Dealership Groups," available at https://www.autonews.com/retail/top-150-dealership-groups/2025/). As of September 2025, AutoNation, one of the largest automotive retailers in the U.S., had more than 240 dealerships, concentrated in the Sunbelt. In 2024, Auto Nation had new vehicle sales of $13.0 billion. AutoNation, Inc. form 10-Q for the quarterly period ended September 30, 2025, available at https://www.sec.gov/Archives/edgar/data/350698/000162828025046121/an-20250930.htm, p. 5; AutoNation, Inc. form 10-K for the fiscal year ended December 31, 2024, available at https://www.sec.gov/Archives/edgar/data/350698/000035069825000029/an-20241231.htm, p. 2.

[47] See, for example, AutoNation Website, "Find an AutoNation store near you," available at https://www.autonation.com/dealers/results?search=d%3DR%26mk%3D%26c%3DCleveland%

47. This argument also cannot be supported by any economic reasoning. Auto dealers are profit-maximizing businesses and have incentives to build long-term relationships with consumers. As discussed above, manufacturers have greater economic incentives to build long-term relationships with consumers than franchised dealers do because consumers who move locations are unlikely to remain customers of the local franchised dealer, but they may well remain loyal to a manufacturer's brand. The importance of developing this customer loyalty is especially high for new entrants, such as Rivian, which can compete effectively against established manufacturers only by building their brand. The proposition that an auto manufacturer is less likely to build long-term relationships with consumers than a franchised dealer is incorrect as a matter of basic economics.

48. The same is true of local investment. Whether a dealership is owned and operated by a manufacturer or a dealer, that dealership will provide jobs and have an incentive to invest in the local community. As explained below, Ohio's direct-sales ban will keep Rivian and other similar innovators out of the Ohio auto retail market. That means that the challenged Ohio law has the effect of preventing manufacturers like Rivian from expanding their presence in Ohio—in other words, the law prevents the creation of new jobs and salaries that would otherwise go to building and investing in stable communities. Authorizing Rivian to sell directly to consumers in Ohio would add jobs for Ohio residents. Each Space would be staffed with employees engaged in sales support, demonstration drives, and branding. If Rivian is prohibited from selling in Ohio, Ohio will lose these jobs. Ohio will also lose the tax revenue and economic activity associated with these jobs and sales.

49. Nor is there any reason to believe that manufacturers are less philanthropic than franchised dealers. Businesses like auto manufacturers and dealers engage in philanthropy to build goodwill and both auto manufacturers and dealers have incentives to do this. Auto

---

26s%3DOH%26z%3D44114; Penske Website, "Dealer Locator," available at https://www.penskeautomotive.com/locations/?brand=&country=United+States&state=Ohio.

manufacturers engage in philanthropic projects, both large and small.[48] Rivian is no exception. Rivian dedicated 1% of its equity at the time of its November 2021 IPO to establish an independent philanthropic platform, the Rivian Foundation.[49] Rivian's philanthropic efforts focus on "addressing climate challenges, protecting nature, advancing a better energy future, and expanding opportunities for people and communities to thrive."[50] The Rivian Foundation began grantmaking in 2024 and has awarded a total of $11.3 million to initiatives in 15 U.S. states, the District of Columbia, and Puerto Rico.[51]

50. It is certainly true that the Ohio law at issue also protects franchised dealers from competition. And any time a particular industry is singled out for economic protectionism, that industry will earn more profit, some fraction of which might be invested in local communities, or might not. But I know of no economic rationale that would favor economic protectionism on the ground that some of the monopolistic rents earned from that protectionism might be invested in the community. Such a theory, should it exist, would be true of many (if not all) protected industries, and would be extremely expensive for consumers. As a group of dozens of professors of economics, law, business, and public policy who signed a joint letter objecting to a similar New Jersey law barring direct auto sales correctly explained,

> [w]hile we have no doubt that many automobile dealers make important contributions to their local communities, this is a terrible justification for stifling innovation and making automobile markets less competitive through protectionist regulation. There is no evidence that auto dealers make better philanthropic citizens than would any other economic special interest granted a protected

[48] *See*, for example, Stellantis, "FCA Community Stories," available at https://media.stellantisnorthamerica.com/newsrelease.do?id=20943&mid=1; General Motors, "Corporate Giving," available at https://www.gm.com/impact/corporate-giving; Ford, "Community," available at https://corporate.ford.com/social-impact/community.html.
[49] Rivian Website, "The Rivian Foundation," available at https://stories.rivian.com/foundation-launch.
[50] Rivian 2024 Form 10-K, p. 13.
[51] Rivian 2024 Form 10-K, p. 13; Rivian Foundation Website, "What we fund," available at https://rivianfoundation.org/what-we-fund#focus-areas. Of the Rivian Foundation's $12.8 million in awards to date, $11.3 million funded initiatives in the following U.S. locations: California, Colorado, Florida, Georgia, Illinois, Kentucky, Michigan, Montana, Nevada, New Mexico, New York, Oregon, Tennessee, Texas, Washington State, Washington DC, and Puerto Rico. Global ocean and climate conservation initiatives were awarded $1.2 million, and $300,000 was awarded in support of wilderness conservation in Kenya, Africa.

position. If the goal is to encourage local philanthropy, there are many better ways than blocking efficient distribution methods to the detriment of consumers.[52]

51. Furthermore, the protection that direct-sales bans provide to franchised dealers can come at the expense of manufacturer profits.[53] For example, under Ohio law a manufacturer must compensate an auto dealership upon termination. This compensation includes repurchasing new, undamaged vehicles, parts, specialized tools, and signage at cost.[54] As a result, a manufacturer cannot adjust its network to declining demand without paying a substantial penalty.[55]

### C. <u>Ohio's Sales Ban Has No Effect on the Availability of Service If the Manufacturer Fails</u>

52. Proponents may claim that local independent dealers may stay in business even when manufacturers experience failure or insolvency, thus providing continuity of service and support for consumers with those vehicles. I note that this argument appears to be irrelevant to this case, which addresses a sales prohibition and not a service and support prohibition. Regardless, this argument is flawed as a matter of economics.

53. A franchised dealer's ability to service cars after a manufacturer's bankruptcy depends in part on the continued availability of the defunct manufacturer's vehicle parts post-bankruptcy. If required parts are available after a manufacturer's bankruptcy, then franchised dealers and independent repair shops will be able to continue servicing the manufacturer's vehicles. If required parts are unavailable after a manufacturer's bankruptcy, then continued service will be impossible. And whether or not a manufacturer's parts are available after a manufacturer's bankruptcy does not depend in any way on whether the manufacturer sells through franchised dealers.

---

[52] Letter from International Center for Law and Economics to Governor Chris Christie, March 26, 2014, available at http://www.laweconcenter.org/images/articles/tesla_letter_icle.pdf.
[53] Lafontaine and Scott Morton (2010), p. 234, 238-241.
[54] Ohio Laws & Administrative Rules, "Section 4517.542 | Termination of franchise; compensation," available at https://codes.ohio.gov/ohio-revised-code/section-4517.542.
[55] Lafontaine and Scott Morton (2010), pp. 234, 238-241.

54. A manufacturer's parts may continue to be available if the manufacturer continues to exist in some form. Alternatively, if there is sufficient demand for a manufacturer's parts, a third party may begin manufacturing them, in which case such parts may continue to be available after the manufacturer's bankruptcy. But if neither the manufacturer nor a third party continues making required parts after the manufacturer's bankruptcy, then those cars will no longer be serviceable, regardless of whether or not they are sold through franchised dealers. The flaw in this argument is that the existence of franchised dealers does not affect whether anyone will continue manufacturing vehicle parts after a manufacturer's partial or complete failure.

55. More generally, dealers that primarily sell and service the cars of a particular manufacturer may go out of business (or convert to other franchises) after a manufacturer's bankruptcy.[56] While it is true that some dealerships may remain in business in the wake of the manufacturer's bankruptcy by selling used vehicles and providing out-of-warranty support, the service arm of a direct-sales manufacturer, like Rivian, could do the same. Furthermore, I understand the National Traffic and Motor Vehicle Safety Act of 1966 states that a manufacturer's bankruptcy does not extinguish its recall obligations,[57] so as to ensure that funding for recall-related services will be available even when a manufacturer goes out of business.

### D. There Is No Evidence or Theoretical Reason to Conclude that Dealers Will Provide More "Levels of Service" Than Manufacturers

56. Proponents may claim that independent dealers promote the availability of post-sale mechanical and operational services. In support of this argument, proponents may claim that independent dealers are able to provide multiple levels of service, including repair and storage

---

[56] See, for example, Reuters, "GM settles on 4,500 dealers, still some opposition," November 1, 2010, available at https://www.reuters.com/article/world/gm-settles-on-4500-dealers-still-some-opposition-idUSTRE6A1058/.

[57] Legal Information Institute, "49 U.S. Code § 30120A - Recall obligations and bankruptcy of a manufacturer," available at https://www.law.cornell.edu/uscode/text/49/30120A; U.S. Department of Transportation, "ODI Resume," available at https://static.nhtsa.gov/odi/inv/2009/INCLA-AQ09002-9536.PDF.

lots, that are integral to vehicle ownership. But as a matter of basic economics, manufacturers have equal, if not greater, incentives to provide levels of service integral to vehicle ownership.

57. There is no evidence or theoretical reason for a franchised dealer to have greater incentives or ability than manufacturers to provide service to consumers. FTC economists have concurred that providing inadequate customer service is contrary to the economic self-interest of an auto manufacturer.[58] That elementary point applies not only to the quality of service, but also to levels of service. Manufacturers, like franchised dealers, will be driven to provide whatever levels of service the market demands, and any manufacturer—or dealer—that is unable to provide the levels of service customers demand will be punished in the marketplace.

58. Nor is there any reason that a franchised dealer will have a greater ability to offer numerous levels of service than will manufacturers. If anything, vertical integration will allow a car manufacturer to provide enhanced levels of service that franchised dealers cannot provide.

59. Rivian illustrates this point. Despite its inability to sell directly to consumers in Ohio, Rivian has established three service centers in the state.[59] Rivian service centers, of course, provide the services offered at franchised dealer service centers, including warranty and non-warranty service, maintenance, and repairs, loaner cars, and body shop support.[60] Rivian also provides services more often associated with manufacturers, including 24/7 customer support

[58] *See* FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-missouri-house-representatives-regarding-house-bill-1124-which-would-expand/140515mo-autoadvocacy.pdf; FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014 available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-new-jersey-general-assembly-regarding-assembly-bills-2986-3096-3041-3216-which/140516nj-autoadvocacy.pdf.

[59] Rivian Website, "Where are Rivian Service Centers located in the United States?" available at https://rivian.com/support/article/where-are-rivian-service-centers-located-in-the-united-states.

[60] Rivian 2024 Form 10-K, pp. 4-5; Rivian Website, "Service Terms," available at https://rivian.com/legal/service.

and roadside assistance.[61] In addition, Rivian provides mobile service offerings along with fixes and improvements via over-the-air software updates.[62] Rivian also has built and maintains a high-speed vehicle charging network for its customers (the "Rivian Adventure Network") as well as other charging infrastructure.[63]

60. But even if a franchised dealer and a direct-sales manufacturer were able to provide the same levels of service to their customers, the important point is that there is no evidence or theoretical reason to support the argument that franchised dealers have any greater incentive or ability to provide multiple levels of service to their customers than do manufacturers.

### E. Franchised Dealers Are Not Able to Obtain Better Financing for Their Customers Than Manufacturers Can

61. Proponents may attempt to justify Ohio's direct-sales ban on the ground that independent dealers will be able to understand their community's credit needs and provide better and more targeted lending options than a large manufacturer. There is no evidence or theoretical support for this assertion.

62. As a matter of economic incentives, direct-selling manufacturers have the same motivation to offer favorable financing options for potential car buyers as do franchised dealers, because manufacturers are just as motivated to sell cars—perhaps more so, because manufacturers can keep customers when they move, whereas franchised dealers likely cannot. Nor will franchised dealers be any better able than manufacturers at providing such favorable

---

[61] Rivian Website, "Service," available at https://rivian.com/experience/service; Rivian Website, "Does Rivian provide Roadside Assistance?" available at https://rivian.com/support/article/does-rivian-provide-roadside-assistance.
[62] Rivian Website, "How Does Service Work?" available at https://rivian.com/support/article/how-will-service-work; Rivian Prospectus, p. 126; Rivian 2024 Form 10-K, pp. 4-5.
[63] Rivian Website, "What is the Rivian Adventure Network?" available at https://rivian.com/support/article/what-is-the-rivian-adventure-network; Rivian Website, "What are Rivian Waypoints chargers?" available at https://rivian.com/support/article/what-are-rivian-waypoints-chargers.

financing options for their customers. Manufacturers, just like franchised dealers, are able to partner with banks to provide financing options for their customers.

63. To the extent this argument is that franchised dealers are better able to provide financing options for their customers because they are "local," that too is unsupported. As discussed, the dealer conglomerates that now own a large percentage of franchised dealerships are no more local than Rivian or any other national manufacturer. This argument would be illogical in any event, because if a manufacturer such as Rivian were allowed to sell its vehicles in Ohio, then its Spaces—and the employees who work there—would be local. Thus, to the extent local knowledge is required to address customer credit needs, a manufacturer's local sales employees would be no less able to provide such local knowledge than would franchised dealers.

64. In fact, a direct-sales manufacturer may have a greater incentive than an independent dealer to reduce the price of ancillary services like financing. If demand for an ancillary service such as financing affects demand for the vehicle itself, then a reduction in the price of the ancillary service will increase demand for the vehicle, and some buyers who had been considering a different make of vehicle will now consider buying the manufacturer's make instead. The direct-sales manufacturer will benefit from the increased demand in the form of profit on each additional vehicle sold.

65. In contrast, an independent dealer who reduces the price of a complementary service like financing may expect a lower incremental profit compared to the direct sales manufacturer. An independent dealer who reduces the price of the ancillary service will increase demand for that make of vehicle, but the independent dealer must then compete with other independent dealers who sell vehicles of the same make, and so each dealer is likely to attract only a subset of the incremental buyers. Furthermore, since the incremental buyers are, by definition, relatively price sensitive, and the vehicles the independent dealers are selling are close substitutes from the buyer's perspective, independent dealers' margins on sales to these buyers may be relatively low. As a result, an independent dealer who reduces the price of a complementary service like financing may expect a lower margin per incremental sale as well as

fewer incremental units sold, compared to a direct-sales manufacturer. For these reasons, a direct-sales manufacturer may have a greater incentive than an independent dealer to reduce the price of ancillary services like financing.

### F. **Manufacturers' Incentives Are at Least as Strong as Those of Franchised Dealers to Foster Long-Term Customer Relationships, to Cover Warranty and Out-of-Warranty Service Expense, and to Quickly and Effectively Act on Recalls**

66. Proponents may attempt to justify Ohio's direct-sales ban on the ground that manufacturers have a "conflict of interest" when it comes to providing warranty, recall, and out-of-warranty service because the manufacturer must pay for that service, whereas for dealers the provision of the services is a profit center. I note that this argument appears to be irrelevant to this case, which addresses a sales prohibition and not a service and support prohibition.

67. Moreover, this argument ignores that manufacturers have equal (if not greater) incentives than do franchised dealers to invest in long-term customer relationships, as discussed above; manufacturers have greater incentives to cover warranty and out-of-warranty service when no franchised dealer is involved; and manufacturers have not only the incentive but the obligation to effectively carry out recalls.

68. Proponents' argument that the direct-sales model will undermine consumers' access to vehicle service is based in part on the incorrect premise that franchised dealers have stronger incentives to invest in long-term relationships with customers than do manufacturers. As already explained, if anything manufacturers have a greater incentive than dealers to act in customers' long-term interests because manufacturers can keep customers when they move, whereas franchised dealers likely cannot. Similarly, if a customer's vehicle breaks down out-of-state, the manufacturer-owned service center has a stronger incentive to provide excellent service than does the franchised dealer who would recognize the interaction with the out-of-state customer as a one-time event. Warranties are another indication of manufacturers' incentives to invest in long-term relationships with customers. By offering a warranty, a manufacturer shifts some of the risk of long-term vehicle reliability from the buyer to the manufacturer.

69. Out-of-warranty service provides another good example. Manufacturers will agree to a franchised dealer's request to cover out-of-warranty service if doing so will promote the manufacturer's brand and build goodwill. The manufacturer has an incentive to promote its brand and build goodwill regardless of whether it is the manufacturer or the franchised dealer who provides the service. In fact, the manufacturer has greater incentive to cover out-of-warranty service—or engage in any service-related goodwill-building behavior—when the manufacturer itself provides service. After all, if the manufacturer covers out-of-warranty service and does the service itself, the manufacturer gets the entire benefit of the new goodwill, and does not share it with the franchised dealer. What is more, the manufacturer can actually perform the out-of-warranty service for a lower cost when there is no franchised dealer involved. In many states, including Ohio,[64] state laws allow the franchised dealer to mark up its service bill to the manufacturer, which generates significant profits for the franchise.[65] Economic theory would predict that a manufacturer would be more willing to cover out-of-warranty service (or any other service) with a direct service model, in which it has lower costs and can expect a greater benefit.

70. The same basic economic incentives render implausible the suggestion that manufacturers will more effectively complete recalls when franchised dealers are involved. Effectively providing recall notices to car owners and servicing the problem is integral to any auto manufacturer's brand. If a manufacturer's customers do not promptly receive recall notices, and if the manufacturer cannot quickly and conveniently address the recalls, the manufacturer's customer relationships and brand will suffer.

71. Setting aside the economic incentives, federal law already requires auto manufacturers to report defects to the federal government, make recalls where required, notify consumers, and cover any required service. Failure to complete timely recalls not only damages

[64] Ohio Laws & Administrative Rules, "Section 4517.52 | Fulfillment and compensation for warranty and recall obligations," available at https://codes.ohio.gov/ohio-revised-code/section-4517.52 and https://codes.ohio.gov/ohio-revised-code/section-4517.52/9-30-2025.
[65] Lafontaine and Scott Morton (2010), p. 240.

customer goodwill, but can lead to interventions by enforcement authorities.[66] Requiring that franchised dealers perform the recall service adds nothing to manufacturers' incentives or legal obligations—but it does add administrative costs, not to mention the dealers' mark-up on the cost of service billed to the manufacturer.

72. The involvement of franchised dealers may actually undermine a manufacturer's recall efforts. A study conducted by the University of Michigan found that one of the greatest barriers to compliance with vehicle safety recalls was consumer distrust of dealers.[67]

### G. Potential Justifications for Ohio's Direct-Sales Prohibition Are Inconsistent with Tesla's Direct Sales Operations in Ohio

73. Potential justifications for Ohio's direct-sales prohibition are inconsistent with the fact that state law allows Tesla to sell directly to consumers in Ohio. Tesla has been licensed to sell directly to consumers in Ohio since 2013;[68] a state law was enacted in 2014 confirming its ability to sell directly to consumers.[69] Tesla currently has showrooms in Cincinnati, Cleveland, and Columbus, pop-up shops in Howland Township and Strongville, and service centers in Akron and Dayton.[70] If the state has concerns about direct sales by auto manufacturers, it is not clear why the state allows Tesla to operate a direct-sales model in the state. It is also not clear why Tesla is allowed to sell directly to consumers in Ohio but other direct-sales vehicle

---

[66] The National Highway Traffic Safety Administration (NHTSA) issues vehicle safety standards and requires manufacturers to recall vehicles and equipment that have safety-related defects. (National Highway Traffic Safety Administration, "Check for Recalls," available at https:\\www.nhtsa.gov/recalls). Rivian lists recall information on its website as well as a link to the recall lookup page of the NHTSA website. (Rivian Website, "Recall Information," available at https://rivian.com/support/article/recall-information.)

[67] Safety + Health, "Survey asks consumers: Why do you ignore vehicle recalls?" April 19, 2017, available at https://www.safetyandhealthmagazine.com/articles/15590-survey-asks-consumers-why-do-you-ignore-vehicle-recalls.

[68] The Columbus Dispatch, "Easton gets Ohio's first Tesla store," Nov. 28, 2013, available at https://www.dispatch.com/story/business/2013/11/28/easton-gets-ohio-s-first/24215898007/.

[69] Cleveland.com, "Panel approves bill that allows Tesla Motors to operate 3 stores in Ohio," Mar. 25, 2014, available at https://www.cleveland.com/open/2014/03/panel_approves_bill_that_allow.html.

[70] Tesla Website, "US Tesla Stores and Galleries," available at https://www.tesla.com/findus/list/stores/United States.

manufacturers, like Rivian, are not allowed to do so. I am not aware of any allegation that Tesla's direct-sales presence in Ohio has led to reduced competition or other harms.

## VII. AN INDEPENDENT RIVIAN DEALER WOULD NOT BE ECONOMICALLY VIABLE

74. Based on Rivian's product and scale, Rivian's sales and service model makes sense for its business, while the independent dealership model does not. The hypothetical independent Rivian dealer would need to compete with Rivian's fixed and uniform retail prices, leaving it no margin with which to fund its buildings and inventory. Rivian would not have an incentive to sell to an independent dealer at a lower wholesale price because Rivian would be unable to ensure that an independent dealer would adhere to Rivian's intended sales experience, including a low-pressure sales environment and a focus on customer education.

75. Two significant sources of income for traditional dealers—service and parts and used vehicle sales—would not be available or would be greatly reduced for a hypothetical independent dealer selling Rivian cars.[71] Rivian's service and parts revenue will be quite limited due to the relatively small scale of past sales, Rivian's plans to provide service through non-traditional channels (over-the-air or with mobile service vehicles) as well as directly, and electric vehicles' lower maintenance requirements.[72] In addition, the pool of available Rivian used vehicles will be small for years to come. Moreover, because the product (as well as the company) is relatively new and novel, selling Rivian's all-electric vehicles will require different selling behavior, different sales skills, and a different environment than are required for motor vehicle

[71] New car sales, net of profits from F&I, generated 13% of an average dealership's gross margin in 2016-October 2021. Vehicle service, financing, and used car sales were more important sources of profit. *See* Exhibit 1 in Appendix C.

[72] Rivian 2024 Form 10-K, p. 5; Rivian Website, "How Does Service Work?" available at https://rivian.com/support/article/how-will-service-work; Rivian Website, "What are remote diagnostics?" available at https://rivian.com/support/article/what-are-remote-diagnostics. EVs do not require oil changes, spark plug replacements, or timing belt replacements, among other routine maintenance tasks. A 2021 study estimated that maintenance costs per mile for battery electric vehicles are 41% less than those for comparable gas-powered vehicles. (Energy Systems Division, Argonne National Laboratory, "Comprehensive Total Cost of Ownership, Quantification for Vehicles with Different Size Classes and Powertrains," April 2021, pp. 82-85, available at https://publications.anl.gov/anlpubs/2021/05/167399.pdf).

sales generally. Again, this would require Rivian-specific investments by a dealer. In brief, the hypothetical independent Rivian dealer would be expected to earn zero margin on new car sales in perpetuity while bearing significant fixed costs, leading to financial losses. For these reasons, the independent dealer sales model is not viable for Rivian's vehicles.

## VIII. CONCLUSION

76. Rivian manufactures and sells innovative electric vehicles. Rivian has determined that its business is best served by selling its vehicles direct to consumers. It does not sell through independent dealers. Because an independent Rivian dealer would not be economically viable, Ohio's requirement that Rivian sell its cars through an independent dealer effectively bars it from selling in the state.

77. More generally, the unambiguous effect of Ohio's law barring direct sales of cars by auto manufacturers other than Tesla is to stifle competition, harm consumers, and create an artificial barrier to the entry of new companies and technologies into the automobile market. As an economist who has studied regulation and competition, it is my opinion that there is no reason to prohibit manufacturers like Rivian from directly selling vehicles and that allowing Rivian to sell direct to consumers in Ohio would have a positive effect on consumers as it would increase consumer choice, eliminate the risk of double marginalization, serve local consumers, and contribute to the local economy.



Professor Fiona Scott Morton

Executed on March 14, 2026

# Appendix A

CRA Charles River Associates

December 2025


# Fiona M. Scott Morton

Senior Consultant

PhD, Economics
Massachusetts Institute of Technology

BA, Economics
Yale University


Fiona M. Scott Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management. From May 2011 to December 2012, she was Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the US Department of Justice. Dr. Scott Morton ensured that the Division's economic team provided sound analysis in support of the DOJ's enforcement action and policy, including the competitive effects of mergers and unilateral conduct. While at the DOJ, she frequently spoke on antitrust enforcement in high-technology industries as well as on topics where modern economic analysis can be used to evaluate the impact of firm conduct.

Prof. Scott Morton's expertise and research area is the study of firms, markets, and competition. Her research and consulting work have involved a variety of industries such as merchant shipping, wineries, funeral homes, ecommerce, auto retailing, magazines, healthcare and a number of areas in the pharmaceutical industry including competition, generic entry, and procurement of pharmaceuticals for Medicaid and Medicare. Prof. Scott Morton's research is widely disseminated in top scholarly publications and through frequent invited research seminars and conferences. She has served in an editing role on various academic economics journals and has published articles in the *American Economic Review*, the *RAND Journal of Economics*, the *Journal of Industrial Economics,* and the *Quarterly Journal of Economics*.

Prof. Scott Morton taught at the business schools of Stanford and the University of Chicago prior to joining the Yale faculty. She is founder and Director of the Thurman Arnold Project, a program that delivers competition economics programming to Yale students. Beginning in 2025 she has taught Antitrust Law at the Yale Law School. At the Yale School of Management Prof. Scott Morton has taught Competition Economics and Competitive Strategy, served as Associate Dean for Faculty Development, and won the school's teaching award three times. She holds dual citizenship in the UK and has visited and taught at the University of Edinburgh School of Economics.

## Employment and affiliations

| | |
|---|---|
| 2014–Present | *Theodore Nierenberg Professor of Economics*, Yale School of Management |
| 2008–Present | *Visiting Professor*, University of Edinburgh Economics Department |
| 2013–Present | *Senior Consultant*, Charles River Associates |
| 2002–2014 | *Professor of Economics*, Yale School of Management |

| | |
|---|---|
| 2011–2012 | *Deputy Assistant Attorney General for Economic Analysis*, Antitrust Division, US Department of Justice |
| 2006–2011 | *Senior Consultant*, Charles River Associates |
| 2006–2010 | *Senior Associate Dean for Faculty Development*, Yale School of Management |
| 2005–2006 | *Adam Smith Visiting Fellow*, Department of Economics, University of Edinburgh, Scotland |
| 2000–2002 | *James L. Frank '32 Associate Professor of Private Enterprise and Management*, Yale School of Management |
| 1999–2000 | *Associate Professor of Economics and Strategy*, Yale School of Management |
| 1997–1999 | *Assistant Professor of Economics and Strategy*, Graduate School of Business, University of Chicago |
| 1994–1997 | *Assistant Professor of Strategic Management*, Graduate School of Business, Stanford University |
| 1991–1992 | *Instructor for Economics 10*, Prof. Martin Feldstein, Harvard University |

## Scholarly publications

Scott Morton, Fiona, Alissa Cooper, David Dinielli, Paul Heidhues, Gene Kimmelman, Margaret O'Grady, and Monika Schnitzer (2025), "Judicial Remedies to Restore Competition in the Market for General Search," *Michigan State Law Review Forum*.

Amelia Fletcher, Jacques Crémer, Paul Heidhues, Gene Kimmelman, Giorgio Monti, Rupprecht Podszun, Monika Schnitzer, Fiona Scott Morton, Alexandre de Streel, "The Effective Use of Economics in the EU Digital Markets Act," *Journal of Competition Law & Economics*, 2024.

Co-author in a series of articles in the *Yale Journal on Regulation:* 40:3 (2023)

- Fletcher, Amelia et al "Consumer protection for online markets and large digital platforms"
- Heidhues, Paul et al "More competitive search through regulation"
- Cremer, Jacques, et al "Fairness and contestability in the Digital Markets Act"
- Scott Morton, Fiona et al "Equitable Interoperability: The "Super Tool" of digital platform governance"
- Bergemann, Dirk et al "Market Design for Personal Data"

Azad, Nitzan, Robin Feldman, and Fiona Scott Morton (2022) "Barriers to Entry in Pharmaceutical Markets," Chapter 1 in Stigler Center and Healthcare Initiative, The Economics of US Healthcare: Competition, Innovation, Regulation, and Organizations, May 2023.

Athey, Susan and Fiona Scott Morton (2022) "Platform Annexation" *Antitrust Law Journal*: 84:3:677-704.

Miller, Nathan et al (2022) "On the Misuse of Regressions of Price on the HHI in Merger Review" *Journal of Antitrust Enforcement:* 10: 2: 248–259

Scott Morton, Fiona and David Dinielli (2022) "A Roadmap for an Antitrust Case against Facebook" *Stanford Journal of Law, Business and Finance:* 27: 267

Rosenquist, J Niels, Fiona Scott Morton, and Samuel Weinstein (2022) "Addictive Technology and its Implications for Antitrust Enforcement", 100 *North Carolina Law Review* 431.

Beck, Marissa and Fiona Scott Morton (2021) "Evaluating the Evidence on Vertical Mergers," *Review of Industrial Organization:* 59, pp 273–302

Salop, Steven and Fiona Scott Morton (2021) "The 2010 HMGs Ten Years Later: Where Do We Go From Here?" *Review of Industrial Organization:* 58:1: pp81-101

Hovenkamp, Herbert and Fiona Scott Morton (2020) "Framing the Chicago School of antitrust analysis," *University of Pennsylvania Law Review,* 168: 7, pp1843-1878

"Physician Agency, Consumerism, and the Consumption of Lower-Limb MRI Scans." With Michael Chernew, Zack Cooper, and Eugene Larsen Hallock. *Journal of Health Economics*, Vol. 76, March 2021.

"Surprise! Out of Network Billing for Emergency Care in the United States." With Zack Cooper and Nathan Shekita. *Journal of Political Economy*: 128: 9: 3626–3677, 2020.

"Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians." With Zack Cooper and Nathan Shekita. *Health Affairs* 39: 1, December 16, 2019.

"Do Increasing Markups Matter? Lessons from Empirical Industrial Organization." With Steven Berry and Martin Gaynor. *The Journal of Economic Perspectives,* 33: 3: 44–68, 2019.

"Antitrust and Innovation: Welcoming and Protecting Disruption." With Guilio Federico and Carl Shapiro. In *Innovation Policy and the Economy*, Josh Lerner and Scott Stern, eds. vol. 20. NBER, 2019.

Scott Morton, Fiona (chair) et al., (2019) Report of the Market Structure and Antitrust Subcommittee, Digital Platforms Project, George J Stigler Center for the Study of the Economy and the State, The University of Chicago Booth School of Business, June 2019.

"The Impacts of the Entry of Biosimilars: Evidence from Europe." With Ariel Dora Stern, and Scott Stern. *Review of Industrial Organization*, 53, No. 1 (August 2018): 173-210 (https://doi.org/10.1007/s11151-018-9630-3)

"The antitrust case against platform MFNs." With Jonathan Baker. *Yale Law Journal*, May 2018.

"The antitrust case against horizontal shareholding." With Herbert Hovenkamp. *Yale Law Journal*, May 2018.

"The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program." With Kate Ho and Joseph Hogan. *RAND Journal of Economics*, 48(4): 877–905, 2017.

"A Proposal to Limit the Anticompetitive Power of Institutional Investors." With Eric A. Posner and E. Glen Weyl. *Antitrust Law Journal*, 81(3): 669–728, 2017.

"A Unifying Analytical Framework for Loyalty Rebates." With Zachary Abrahamson. *Antitrust Law Journal*, 81(3): 777–836, 2017.

"Contracts that Reference Rivals." Chapter 7, Antitrust Economics for Lawyers. LexisNexis, 2017.

"Enabling Competition in Pharmaceutical Markets." With Lysle Boller. *Brookings Institution, Hutchins Center Paper # 30*, 2017.

"Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise." With Zack Cooper. *New England Journal of Medicine,* 375(20): 1915–1918; Reprinted in *NEJM Catalyst,* December 2016.

"Market Size and Pharmaceutical Innovation." With Pierre Dubois, Olivier de Mouzon, and Paul Seabright. *RAND Journal of Economics,* 46(4): 844–871, 2015.

"Patent Assertions: Are We Any Closer to Aligning Reward to Contribution?" With Carl Shapiro. *NBER Innovation Policy and the Economy,* 2015.

"Strategic Patent Acquisitions." With Carl Shapiro. *Antitrust Law Journal,* 79(2): 463–499, 2014.

"Hospitals, Market Share, and Consolidation: How Should Policy React?" With David Cutler. *Journal of the American Medical Association,* 310(18), 1964–70, November 2013.

"Pay-for-Delay." *Competition Policy International,* 9(2), 2013.

"Research into biomarkers: How does drug procurement affect the design of clinical trials?" With Paul Seabright. *Health Management, Policy, and Innovation,* 1(3), 2013.

"Contracts that Reference Rivals." *Antitrust Magazine*, 72–79, Summer 2013.

"Developing an Administrable MFN Enforcement Policy." With Steven Salop. *Antitrust Magazine*, 65–73, Spring 2013.

"Standard Setting Organizations Can Help Solve the Standard Essential Patents Licensing Problem." With Kai-Uwe Kuhn and Howard Shelanski. *CPI Antitrust Chronicle,* March 2013.

"The Year in Review: Economics at the Antitrust Division: 2011." With W. Robert Majure. *Review of Industrial Organization*, 41(4): 321–331, 2012.

"What Matters in a Price Negotiation: Evidence from the US Auto Retailing Industry." With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 9: 365–402, 2011.

"Data Impediments to Empirical Work in Health Insurance Markets." With Leemore Dafny, David Dranove, and Frank Limbrock. *BE Journal of Economic Analysis and Policy,* 11(2): Article 8, 2011.

"The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices." With Mark Duggan. *American Economic Review Papers and Proceedings,* 101(3): 387–392, 2011.

"Pharmaceutical Markets." With Margaret Kyle. *Handbook of Health Economics*, vol. 2, ch. 12, 763–823, Elsevier, 2011.

"State Franchise Laws, Dealer Terminations, and the Auto Crisis." With Francine Lafontaine. *Journal of Economic Perspectives,* 24(3): 233–50, 2010.

"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review,* 100(1): 590–607, 2010.

"Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D." With Mark Duggan and Patrick Healey. *Journal of Economic Perspectives,* 22(4): 69–92, 2008.

"State Casket Sales Restrictions: a Pointless Undertaking?" With Judith A. Chevalier. *The Journal of Law and Economics,* 51(1) 1–23, 2008.

"How the Internet Lowers Prices: Evidence from Matched Survey and Auto Transaction Data." with Florian Zettelmeyer and Jorge Silva-Risso. *Journal of Marketing Research,* 43(2): 168–181, 2006.

"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing." With Mark Duggan. *The Quarterly Journal of Economics,* 121(1): 1–30, 2006.

"Behavioral Biases Meet the Market: The Case of Magazine Subscription Prices." With Sharon M. Oster. *The Berkeley Electronic Press: Advances in Economic Analysis & Policy,* 5(1) Article 1, 2005.

"Consumer Benefit from Use of the Internet" *NBER Innovation Policy and the Economy*, 6: 67–90, 2005.

"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations." With Florian Zettelmeyer. *Review of Industrial Organization,* 24(2): 161–194, 2004.

"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Woman and Minorities?" With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 1(1): 65–92, 2003.

"Love or Money? The Effects of Owner Motivation in the California Wine Industry." With Joel M. Podolny. *The Journal of Industrial Economics,* 50(4): 431–456, 2002.

"Horizontal Integration Between Brand and Generic Firms in the Pharmaceutical Industry." *Journal of Economics & Management Strategy,* 11(1): 135–168, 2002.

"Internet Car Retailing." With Florian Zettelmeyer and Jorge Silva-Risso. *The Journal of Industrial Economics,* 49(4): 501–519, 2001.

"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry." *International Journal of Industrial Organization,* 18(7): 1085–1104, 2000.

"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879–1929." With Joel Podolny. *The Journal of Industrial Economics,* 47 (1): 41–67, 1999.

"Entry decisions in the generic pharmaceutical industry" *The RAND Journal of Economics,* 30(3): 421–440, 1999.

"Misclassification of the Dependent Variable in a Discrete-Response Setting." With J.A. Hausman and Jason Abrevaya. *Journal of Econometrics,* 87(2): 239–269, 1998.

"Entry and Predation: British Shipping Cartels 1879–1929." *Journal of Economics & Management Strategy,* 6(4): 679–724, 1997.

"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored Customer Rules." *The RAND Journal of Economics,* 28(2): 269–290, 1997.

"The Interaction between a Most-Favored Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990 *Journal of Economics & Management Strategy,* 6(1): 151–174, 1997.

## Awards

| | |
|---|---|
| 2020 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2019–20 |
| 2020 | Grant support for the Thurman Arnold Project at Yale from the Anti-Monopoly Fund and Microsoft Corporation |
| 2019 | Grant support for the Thurman Arnold Project at Yale from the Knight Foundation and Omidyar Network |
| 2016 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2015–16 |
| 2014 | HEMA/KPPI Distinguished Visitor, Kellogg GSM, Northwestern University |
| 2011 | Health Care Research Award, National Institute for Health Care Management for "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review* 100(1): 590–607. |
| 2011 | National Science Foundation Research Grant 1064341 for "*The Industrial Organization of the Biologics Industry: Theory, Empirics and Policy.*" |
| 2011 | Excellence in Refereeing Award 2011, *American Economic Review* |
| 2010 | Excellence in Refereeing Award 2010, *American Economic Review* |
| 2007 | Yale School of Management Alumni Association Teaching Award, the only teaching prize awarded at Yale School of Management for the academic year 2006–2007 |
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data." |
| 2005–2008 | National Science Foundation Research Grant 0518858 for "The Effect of Government Procurement of Pharmaceuticals." With Mark Duggan, University of Maryland. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0518858 |
| 2001–2003 | National Science Foundation Research Grant 0111885 for "The Effect of Internet Car Shopping on Prices and Discrimination." With Florian Zettelmeyer, UC-Berkeley. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0111885 |
| 1998–2002 | National Science Foundation Research Grant 9810178 for "Studies of Competition." http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=9810178 |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994–95 |
| 1993–1994 | Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend |

## Courses taught

*Antitrust Law:* The introductory Antitrust Law class for law students at Yale law school.

*Competition Economics and Policy*: An elective MBA course open to undergraduates and law students covering topics in competition enforcement such as cartels, horizontal mergers, monopolization, vertical restraints, exclusive dealing, MFNs, predatory pricing, and IP. The focus is on the economics and managerial implications of competition enforcement.

*Competitive Strategy:* An elective MBA course covering topics in I.O. such as price and quantity competition, entry, and antitrust, as well as strategy concepts such as industry analysis, competitive advantage, and sustainability.

## PhD students supervised (institution, year; first placement)

Andrea Coscelli (Stanford GSB, 1998; University College London)

Brian Viard (University of Chicago GSB, 2000; Stanford GSB)

Paris Cleanthous (Yale, 2003; NYU Stern)

Juan Esteban Carranza (Yale, 2004; Wisconsin-Madison)

Henry Schneider (Yale, 2006; Cornell Johnson School)

Fabian Duarte (Yale, 2010; RAND)

Maliheh Birjandi-Feriz (Yale, 2018; Analysis Group)

Rebecca McKibbin (Yale, 2018, University of Sidney)

## Memberships and professional service

American Economic Association

NBER, Research Associate, Industrial Organization

First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio), Board of Directors (1998–1999)

StreamSage.com, Advisory Board (2000–2004)

*Economic Policy*, Panel (2002–2004)

*Review of Industrial Organization*, Editorial Board (2002–2004)

*The Journal of Industrial Economics*, Associate Editor (2003–2006)

*International Journal of Industrial Organization*, Co-Editor (2005–2008)

*BE Journal of Economics Analysis and Policy*, Editor (2006–2010)

American Economic Association Committee on the Status of Women in the Economics Profession, Board (2007–2009)

*Journal of Economic Perspectives*, Associate Editor (2007–2010)

Scientific Committee, Center for European Economic Research (ZEW) ICT conference (2010)

Program Committee, American Economic Association Meetings (2010)

Scientific Committee, FTC microeconomics conference (2010)

*American Economic Review*, Board of Editors (2011–2013)

Research Advisory Board, CEFAGE, Portugal, member (2013– )

Wharton Business Economics and Public Policy Department, External Review Committee (2016)

AEA Committee on Government Relations (2017–2019)

## Invited research presentations

Dartmouth Econ, MIT Econ, Harvard Econ, Harvard Business School, Harvard School of Public Health, Boston University, Yale Econ, Yale Law, SUNY Stony Brook Econ, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Department of Justice, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, University of Tennessee Knoxville, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, RAND, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Victoria University (Canada), HEC Montreal (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), DG Competition (Belgium), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), University of Warwick (England), Imperial College (England), UCL (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France), University of Auckland (New Zealand)

## Government testimony

Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights on "*Your Doctor/Pharmacist/Insurer Will See You Now: Competitive Implications of Vertical Consolidation in the Healthcare Industry*," June 12, 2019

Senate Judiciary Committee on "Understanding the Digital Advertising Ecosystem and the Impact of Data Privacy and Competition Policy," May 21, 2019

House Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law on "Diagnosing the Problem: Exploring the Effects of Consolidation and Anticompetitive Conduct in Health Care Markets," March 7, 2019

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation," April 2016

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation" (April 2016).

House Oversight and Government Reform Committee Hearing, "*The Medicare Drug Benefit: Are Private Insurers Getting Good Discounts for the Taxpayer?*," July 2008

Senate Finance Committee Hearing, "*Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit*," January 2007

FTC hearings, "*Possible Anticompetitive Efforts to Restrict Competition on the Internet*," Auto Panel, October 2002

## Testimony in litigated or arbitrated matters (Last 4 Years)

Retained on behalf of Microsoft Inc, submitted report in Dr Maria Luisa Stasi, v. Microsoft Corporation and others, Case Np: 1696/7/7/24, UK Competition Appeal Tribunal. Testified December 11-12, 2025.

Retained on behalf of Regeneron Pharmaceuticals, Inc., submitted expert report, was deposed, and testified in Regeneron Pharmaceuticals, Inc. v. Amgen Inc., C.A. No. 22-697-JLH, U.S. District Court, District of Delaware. Deposed May 9, 2024, Testified May 7, 2025.

Retained on behalf of Dr. Or Brook (class representative), submitted report, April 2025, in Dr. Or Brook, v. Google Inc. and others, Case No: 1720/7/7/25, UK Competition Appeal Tribunal.

Retained on behalf of Sirius XM Radio LLC and Pandora Media, LLC, submitted expert reports and was deposed in Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web VI), U.S. Copyright Royalty Judges. Submitted written direct testimony September 10, 2024, and written rebuttal testimony January 17, 2025. Deposed March 7, 2025, and testified April 28, 2025.

Retained on behalf of Tapestry, Inc., submitted expert analysis and rebuttal testimony on the potential anticompetitive effects of the proposed acquisition of Capri Holdings, Ltd. by Tapestry, Inc. in Federal Trade Commission v. Tapestry, Inc., and Capri Holdings Limited, Case No. 1:24-cv-03109-JLR, U.S. District Court, Southern District of New York. Provided opinions and trial testimony on market definition, market power, and unilateral effects of the merger. Deposed August 20, 2024. Testified September 17, 2024.

Retained on behalf of Lucid Group USA, Inc., submitted report, was deposed, in Lucid Group USA, Inc. v. Johnson et al, Case No: 1:22-cv-01116-RP, Western District of Texas. Deposed January 23, 2024.

Retained on behalf of C R Bard, submitted report, was deposed, and testified at trial in AngioDynamics, Inc. v. C.R. Bard, Inc. et al, 1:17-CV-0598, Northern District of New York. Deposed February 25, 2020. Testified October 3, 2023.

Retained on behalf of Dr Liza Lovdahl Gormsen and Class, submitted reports in Dr Liza Lovdahl Gormsen v Meta Platforms, Inc. and Others, UK Competition Appeal Tribunal, Case No: 1433/7/7/22 (2022 - Present).

Matters that remain confidential do not appear on this list.

# Appendix B

# MATERIALS RELIED UPON

## Case Filings

*Rivian LLC. v. Charles L. Norman* filed in the U.S. District Court, Southern District of Ohio, Eastern Division, Complaint, filed August 4, 2025

*Rivian LLC. v. Charles L. Norman* filed in the U.S. District Court, Southern District of Ohio, Eastern Division, Defendant's Answer to Plaintiff's Complaint, filed September 12, 2025

*Rivian LLC. v. Charles L. Norman* filed in the U.S. District Court, Southern District of Ohio, Eastern Division, Defendant's Second Set of Supplemental Responses and Objections to Plaintiff's First Set of Discovery Requests and Responses and Objections to Plaintiff's Second Set of Discovery Requests, filed February 5, 2026

## Other Legal Documents

Legal Information Institute, "49 U.S. Code § 30120A - Recall obligations and bankruptcy of a manufacturer," available at https://www.law.cornell.edu/uscode/text/49/30120A

Ohio Laws & Administrative Rules, "Section 4517.01 | Motor vehicle dealer, auction owner and salesperson definitions," available at https://codes.ohio.gov/ohio-revised-code/section-4517.01

Ohio Laws & Administrative Rules, "Section 4517.50 | Notice of establishment of new dealer or relocation," available at https://codes.ohio.gov/ohio-revised-code/section-4517.50

Ohio Laws & Administrative Rules, "Section 4517.52 | Fulfillment and compensation for warranty and recall obligations," available at https://codes.ohio.gov/ohio-revised-code/section-4517.52 and https://codes.ohio.gov/ohio-revised-code/section-4517.52/9-30-2025

Ohio Laws & Administrative Rules, "Section 4517.55 | Determination of good cause to terminate franchise," at § 4517.55(B)(6), available at https://codes.ohio.gov/ohio-revised-code/section-4517.55

Ohio Laws & Administrative Rules, "Section 4517.542 | Termination of franchise; compensation," available at https://codes.ohio.gov/ohio-revised-code/section-4517.542

*United States of America v. Google Inc. and ITA Software, Inc.*, Case No. 1:11-cv-00688, Final Judgment, filed October 5, 2011, available at https://www.justice.gov/atr/case-document/file/497636/download

**Academic Literature**

Fiona Scott Morton and Ann McDermott, "Retail Auto Sales: Tesla v. State Vehicle Franchise Laws (2017)," in John E. Kwoka, Jr. and Lawrence J. White (eds.), The Antitrust Revolution, Economics, Competition, and Policy (7th Edition). New York: Oxford University Press (2018)

Fiona Scott Morton, Florian Zettelmeyer, and Jorge Silva-Risso, "Internet Car Retailing," *The Journal of Industrial Economics* 49, no. 4 (2001): 501-519

Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives*, 24, no. 3 (2010): 233-250 and online appendix, available at https://assets.aeaweb.org/asset-server/articles-attachments/jep/app/2403_morton_app.pdf

Roger D. Blair and Francine Lafontaine. 2005. The Economics of Franchising, New York, New York: Cambridge University Press

Steve Pociask, "Corporate Welfare: How Automobile Dealership Franchise Regulations Cost Consumers an Additional $48 Billion Annually," *American Consumer Institute Center for Citizen Research*, 2018, available at https://www.theamericanconsumer.org/wp-content/uploads/2018/03/ConsumerGram-2018-FINAL-1.pdf

Steven C. Salop and Daniel P. Culley, "Potential Competitive Effects of Vertical Mergers: A How-To Guide for Practitioners," *Georgetown University Law Center*, 2014

W. Kip Viscusi, Joseph E. Harrington, and John M. Vernon. 1992. Economics of Regulation and Antitrust, Lexington, Massachusetts: D.C. Heath and Company

**Public Documents**

A Girl's Guide to Cars, "Think Car Shopping is Boring, or Scary? Rivian Just Reinvented the Showroom and Test Drive," June 2, 2025, available at https://agirlsguidetocars.com/rivian-space-new-york-experience-review/

Auto Companion, "How Dealers Hit Volume Bonuses (Stair-Step Programs)," December 11, 2025, available at https://www.autocompanion.com/article/bf607208-a4c0-4f09-aa42-62d9d21ce2f0

Automotive News, "2025 Top 150 Dealership Groups," available at https://www.autonews.com/retail/top-150-dealership-groups/2025/

AutoNation, Inc. form 10-K for the fiscal year ended December 31, 2024, available at https://www.sec.gov/Archives/edgar/data/350698/000035069825000029/an-20241231.htm

AutoNation, Inc. form 10-Q for the quarterly period ended September 30, 2025, available at https://www.sec.gov/Archives/edgar/data/350698/000162828025046121/an-20250930.htm

AutoNation Website, "Find an AutoNation store near you," available at https://www.autonation.com/dealers/results?search=d%3DR%26mk%3D%26c%3DCleveland%26s%3DOH%26z%3D44114

Car and Driver, "2027 Rivian R3/R3X," available at https://www.caranddriver.com/rivian/r3

Carmax, "Check out the Total Compensation Highlight Video," available at https://learn.bswift.com/carmax/stock-incentive-program

Chase, "Rivian, Chase Partner to Create an All-Digital Customer Financing Experience," January 14, 2021, available at https://media.chase.com/news/rivian-chase-partner-to-create-an-all-digital-customer-financing-experience

Cleveland.com, "Panel approves bill that allows Tesla Motors to operate 3 stores in Ohio," Mar. 25, 2014, available at https://www.cleveland.com/open/2014/03/panel_approves_bill_that_allow.html

Edmunds, "Where Does the Car Dealer Make Money?" December 16, 2025, available at https://www.edmunds.com/car-buying/where-does-the-car-dealer-make-money.html

Energy Systems Division, Argonne National Laboratory, "Comprehensive Total Cost of Ownership, Quantification for Vehicles with Different Size Classes and Powertrains," April 2021, pp. 82-85, available at https://publications.anl.gov/anlpubs/2021/05/167399.pdf

EV Charging Stations, "Rivian Adventure Network Expands to 780+ Chargers: Q2 2025 Report," August 7, 2025, available at https://evchargingstations.com/chargingnews/rivian-q2-2025-report/

Ford, "Community," available at https://corporate.ford.com/social-impact/community.html

FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-missouri-house-representatives-regarding-house-bill-1124-which-would-expand/140515mo-autoadvocacy.pdf

FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-new-jersey-general-assembly-regarding-assembly-bills-2986-3096-3041-3216-which/140516nj-autoadvocacy.pdf

FTC Staff Comment Regarding Michigan Senate Bill 268, May 7, 2015, available at https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf

General Motors, "Corporate Giving," available at https://www.gm.com/impact/corporate-giving

Georgeta Dragoiu, "Ban on Direct Auto Sales Hurts Consumers and Innovation in Texas," February 25, 2016, available at https://www.tribtalk.org/2016/02/25/ban-on-direct-auto-sales-hurts-consumers-and-innovation-in-texas/

Indeed, "How Much Does a Car Salesperson Make?" July 21, 2022, available at https://www.indeed.com/career-advice/pay-salary/how-much-does-a-car-salesperson-make

Insurance Institute for Highway Safety, "2022 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2022/all/rivian#award-winners

Insurance Institute for Highway Safety, "2023 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2023/all/rivian#award-winners

Insurance Institute for Highway Safety, "2024 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2024/all/rivian#award-winners

Insurance Institute for Highway Safety, "2025 Top Safety Picks," results filtered to "Rivian," available at https://www.iihs.org/ratings/top-safety-picks/2025/all/rivian#award-winners

Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download

Kelley Blue Book, "2027 Rivian R3," available at https://www.kbb.com/rivian/r3/

Letter from International Center for Law and Economics to Governor Chris Christie, March 26, 2014, available at http://www.laweconcenter.org/images/articles/tesla_letter_icle.pdf

Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003

Marina Lao, Debbie Feinstein and Francine Lafontaine, FTC Competition Matters Blog, "Direct-to-Consumer Auto Sales: It's Not Just About Tesla," May 11, 2015, available at https://www.ftc.gov/enforcement/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla

Mississippi Center for Public Policy, "Bill to Ban Direct Vehicle Sales is Anti-Consumer Choice," February 24, 2022, available at https://mspolicy.org/bill-to-ban-direct-vehicle-sales-is-anti-consumer-choice/

Modern Retail, "Rivian's charging outposts are a glimpse into the rest stop of the future," August 25, 2025, available at https://www.modernretail.co/operations/rivians-charging-outposts-are-a-glimpse-into-the-rest-stop-of-the-future/

National Highway Traffic Safety Administration, "Check for Recalls," available at https:\\www.nhtsa.gov/recalls

Open Letter by Academics in Favor of Direct EV Sales and Service, Apr. 14, 2021, available at https://laweconcenter.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide-Academics-Letter-4.14.pdf

Penske Website, "Dealer Locator," available at https://www.penskeautomotive.com/locations/?brand=&country=United+States&state=Ohio

Reuters, "GM settles on 4,500 dealers, still some opposition," November 1, 2010, available at https://www.reuters.com/article/world/gm-settles-on-4500-dealers-still-some-opposition-idUSTRE6A1058/

Rivian Automotive, Inc. Form 10-K for the fiscal year ended December 31, 2024, available at https://www.sec.gov/Archives/edgar/data/1874178/000187417825000007/rivn-20241231.htm

Rivian Automotive, Inc. Form 10-K for the fiscal year ended December 31, 2025, available at https://www.sec.gov/Archives/edgar/data/1874178/000187417826000008/rivn-20251231.htm

Rivian Automotive, Inc., "Prospectus filed pursuant to Rule 424(b)(4)," filed November 9, 2021, available at https://www.sec.gov/Archives/edgar/data/1874178/000119312521328239/d157488d424b4.htm

Rivian Foundation Website, "What we fund," available at https://rivianfoundation.org/what-we-fund#focus-areas

Rivian Website, "A Space to Gather," available at https://stories.rivian.com/venice-hub

Rivian Website, "Charging is easier than you think," available at https://rivian.com/experience/charging

Rivian Website, "Does Rivian provide Roadside Assistance?" available at https://rivian.com/support/article/does-rivian-provide-roadside-assistance

Rivian Website, "Electric vehicles designed for adventure," available at https://rivian.com/

Rivian Website, "How Does Service Work?" available at https://rivian.com/support/article/how-will-service-work

Rivian Website, "Introducing Rivian Charging Outposts," available at https://stories.rivian.com/yosemitechargingoutpost

Rivian Website, "Let's start your R2 reservation," available at https://rivian.com/reserve/r2

Rivian Website, "Plan your next visit," available at https://rivian.com/spaces/locations

Rivian Website, "Purchasing: Explore Rivian's online purchasing process," available at https://rivian.com/experience/purchasing

Rivian Website, "R1S," available at https://rivian.com/r1s

Rivian Website, "R1T," available at https://rivian.com/r1t

Rivian Website, "Recall Information," available at https://rivian.com/support/article/recall-information

Rivian Website, "Rivian Releases Q3 2025 Production and Delivery Figures and Sets Date for Third Quarter 2025 Financial Results," available at https://rivian.com/newsroom/article/rivian-releases-q3-2025-production-and-delivery-figures

Rivian Website, "Service Terms," available at https://rivian.com/legal/service

Rivian Website, "Service," available at https://rivian.com/experience/service

Rivian Website, "Spaces," available at https://rivian.com/spaces

Rivian Website, "The Hamptons, NY Charging Outpost," available at https://rivian.com/spaces/hamptons

Rivian Website, "The Rivian Foundation," available at https://stories.rivian.com/foundation-launch

Rivian Website, "What are remote diagnostics?" available at https://rivian.com/support/article/what-are-remote-diagnostics

Rivian Website, "What are Rivian spaces?" available at https://rivian.com/support/article/what-are-rivian-spaces

Rivian Website, "What are Rivian Waypoints chargers?" available at https://rivian.com/support/article/what-are-rivian-waypoints-chargers

Rivian Website, "What bank does Rivian work with to offer financing?" available at https://rivian.com/support/article/what-bank-does-rivian-work-with-to-offer-financing

Rivian Website, "What can I expect at a Rivian Hub?" available at https://rivian.com/support/article/what-can-i-expect-at-a-rivian-hub

Rivian Website, "What is the Rivian Adventure Network?" available at https://rivian.com/support/article/what-is-the-rivian-adventure-network

Rivian Website, "What is the Starting Price," available at https://rivian.com/support/article/what-is-the-starting-price

Rivian Website, "Where are Rivian Service Centers located in the United States?" available at https://rivian.com/support/article/where-are-rivian-service-centers-located-in-the-united-states

Safety + Health, "Survey asks consumers: Why do you ignore vehicle recalls?" April 19, 2017, available at https://www.safetyandhealthmagazine.com/articles/15590-survey-asks-consumers-why-do-you-ignore-vehicle-recalls

"Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 16, 2015, available at https://s3-prod.autonews.com/s3fs-public/CA98362217.PDF

Stellantis, “FCA Community Stories,” available at https://media.stellantisnorthamerica.com/newsrelease.do?id=20943&mid=1

Tesla Website, “US Tesla Stores and Galleries,” available at https://www.tesla.com/findus/list/stores/United States.

The Columbus Dispatch, “Easton gets Ohio’s first Tesla store,” Nov. 28, 2013, available at https://www.dispatch.com/story/business/2013/11/28/easton-gets-ohio-s-first/24215898007/.

U.S. Department of Transportation, “ODI Resume,” available at https://static.nhtsa.gov/odi/inv/2009/INCLA-AQ09002-9536.PDF

# Appendix C

**Exhibit 1: Percent of Average Dealership's Gross Margin Associated with New Car Sales**

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 thru October | Weighted Average, 2016 - October 2021 |
|---|---|---|---|---|---|---|---|
| **Total Sales** | $59,590,891 | $59,672,779 | $61,230,794 | $61,552,452 | $58,969,430 | $58,690,486 | |
| New Vehicle Department | $34,546,139 | $34,393,462 | $35,286,471 | $34,484,861 | $32,442,238 | $30,565,729 | |
| **Gross Margin** | $6,771,320 | $6,795,692 | $6,881,072 | $7,055,135 | $7,192,489 | $8,297,160 | |
| New Vehicle Department | $1,884,458 | $1,807,654 | $1,761,554 | $1,735,563 | $1,934,780 | $2,754,657 | |
| of which, F&I | $967,292 | $997,410 | $1,023,308 | $1,034,546 | $1,038,152 | $1,039,235 | |
| New Vehicle Department Net of F&I, Percent of Gross Margin | 13.5% | 11.9% | 10.7% | 9.9% | 12.5% | 20.7% | 13.4% |

***Sources:***

NADA Average Dealership Profile, 2016-October 2021, available at:
https://web.archive.org/web/20190417205256/https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474847084
https://web.archive.org/web/20190417205256/https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474856939
https://web.archive.org/web/20210517191029/https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474862698
https://web.archive.org/web/20220103225314/https:/www.nada.org/WorkArea/DownloadAsset.aspx?id=21474865119